Insight Health Corp. v. Marquis Diagnostic Imaging of NC, LLC, 2015 NCBC 7.

STATE OF NORTH CAROLINA

BUNCOMBE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 1783

INSIGHT HEALTH CORP. d/b/a INSIGHT
IMAGING,

        Plaintiff,

v.

MARQUIS DIAGNOSTIC IMAGING OF
NORTH CAROLINA, LLC; MARQUIS
DIAGNOSTIC IMAGING, LLC; JOHN
KENNETH LUKE; GENE VENESKY; and
TOM GENTRY,

        Defendants.

ORDER AND OPINION

{1} **THIS MATTER** is before the Court upon Defendants Gene Venesky and Tom Gentry's Motions to Dismiss pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure (the "Motions") in the above-captioned case.

{2} The Court, having considered the Motions, affidavits, and briefs in support of and in opposition to the Motions, as well as the arguments of counsel at the December 3, 2014 hearing in this matter, hereby **DENIES** the Motions.

*Smith Moore Leatherwood, LLP, by Marcus C. Hewitt and Jeffrey R. Whitley, for Plaintiff.*

*Roberts & Stevens, P.A., by Ann-Patton Hornthal, Wyatt S. Stevens, Stephen L. Cash, and John D. Noor, for Defendants.*

Bledsoe, Judge.

# I.

## BACKGROUND

{3}    The Court limits its recitation of the background to the facts and allegations that are relevant for purposes of resolving the present Motions.[1]

{4}    Plaintiff InSight Health Corp. d/b/a InSight Imaging ("Plaintiff") is a Delaware company authorized to conduct business in North Carolina. (Am. Compl. ¶ 1.)

{5}    Defendant Marquis Diagnostic Imaging of North Carolina, LLC ("MDI-NC") is a North Carolina limited liability company in the business of owning and operating diagnostic imaging centers. (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 2, p. 3.) MDI-NC's operating agreement describes MDI-NC as manager-managed, lists Venesky and Defendant Kenneth Luke as its managers, and includes a North Carolina choice-of-law provision. (*Id.*, Ex. 2, p. 7—8, 13.)

{6}    Although MDI-NC's Articles of Organization are signed by Venesky as MDI-NC's "organizer [and] member" and by Luke as a "member" (*Id.*, Ex. 1, p. 1), MDI-NC is in fact wholly-owned – and has been since its inception – by its sole member, Defendant Marquis Diagnostic Imaging, LLC ("MDI-Parent"), a Delaware limited liability company principally based in Georgia. (*Id.*, Ex. 4, p. 3; Am. Compl. ¶¶ 2—2a.)

{7}    Defendants Venesky, Gentry, and Luke (collectively, the "Individual Defendants") are Georgia residents whose contacts with North Carolina are the

---

[1] "Absent a request by one of the parties, the trial court is not required to make findings of fact when ruling on a motion" to dismiss for lack of personal jurisdiction. *Cameron-Brown Co. v. Daves*, 83 N.C. App. 281, 285, 350 S.E.2d 111, 114 (1986). An appellate court will "presume" that the trial court found facts to support its ruling. *Id.*

focus of the present Motions. Their associations with MDI-NC and MDI-Parent are discussed in further detail below.

{8} In July 2012, Plaintiff and MDI-NC entered into a lease agreement (the "Agreement") pursuant to which Plaintiff agreed to provide a magnetic resonance imaging ("MRI") scanner, as well as a "qualified technologist" to operate the MRI scanner, to MDI-NC in exchange for monthly payments in accordance with the Agreement's payment schedule. (Am. Compl. ¶¶ 13—18; Pl.'s Br. Opp. to Defs.' Mot. to Dismiss, Ex. 4, p. 2.) Luke and Gentry negotiated the Agreement on behalf of MDI-NC (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 3, p. 31), and Luke signed the Agreement in his capacity as MDI-NC's Chief Executive Officer. (*Id.*, Ex. 4, p. 2.) Luke is the only Individual Defendant who does not contest this Court's jurisdiction over him.

{9} The Agreement contemplated a seven-year lease term, which commenced with MDI-NC's first use of the MRI scanner in September 2012. (Am. Compl. ¶¶ 19, 25.) The parties performed consistently with the terms of the Agreement until November 2013, when MDI-NC allegedly stopped making the requisite monthly payments and "stated without explanation that [MDI-NC] was unilaterally stopping services and business operations." (*Id.* at ¶¶ 23, 29, 34—37.)

{10} In a conference call conducted on or about November 18, 2013, Plaintiff alleges that MDI-NC informed Plaintiff that it had sold all of its assets to MedQuest Associates, Inc. ("MedQuest") and that, in doing so, had failed to retain sufficient

assets to pay Plaintiff in accordance with its obligations under the Agreement. (*Id.* at ¶ 30.)

{11} Plaintiff alleges that the Individual Defendants are affiliated with MedQuest and other entities through which, following the sale to MedQuest, the Individual Defendants "caused the [MDI-NC] assets to be transferred with the intent to hinder, delay, or defraud [MDI-NC's] creditors, including [Plaintiff]." (*Id.* at ¶¶ 32, 44–47.)

{12} On February 5, 2014, Plaintiff terminated the Agreement due to MDI-NC's alleged failure to make the monthly payments required under the Agreement. (*Id.* at ¶ 51; Pl.'s Br. Opp. Mot. to Dismiss, Ex. 4, p. 3.) Plaintiff avers that as of the end of February 2014, MDI-NC owed Plaintiff "at least $285,445.14 for payment in arrears, not including the amounts due under the remaining term of the Agreement." (Am. Compl. ¶ 40.) MDI-NC denies that it defaulted on its obligations under the Agreement, but admits that it tendered its last payment under the Agreement on January 31, 2014. (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 4, p. 2.)

{13} On April 25, 2014, Plaintiff filed its original Complaint in this action, asserting claims against MDI-NC and the Individual Defendants for breach of contract, fraudulent transfer, unfair and deceptive trade practices, wrongful distribution and personal liability, breach of fiduciary duty, and constructive fraud.

{14} On July 2, 2014, Defendants Venesky and Gentry moved to dismiss Plaintiff's Complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the North Carolina Rules of Civil Procedure.

{15} On August 28, 2014, Plaintiff filed a Motion for Leave to Amend Complaint and Add Additional Party ("Motion to Amend"), seeking to join MDI-Parent as a Defendant to this action.

{16} The Court held a hearing on Defendants' Motions to Dismiss and Plaintiff's Motion to Amend, as well as other then-pending matters in this action, on December 3, 2014.

{17} By Order entered December 4, 2014, the Court granted Plaintiff's Motion to Amend and deferred ruling on the Motions to Dismiss. Plaintiff filed its Amended Complaint that same day.

{18} Defendants renewed their Motions to Dismiss by moving to dismiss Plaintiff's Amended Complaint on January 5, 2015.[2]

{19} Defendants' Motions to Dismiss are now ripe for decision.[3]

## II.
## ANALYSIS

{20} North Carolina courts apply the following standard in evaluating a motion to dismiss for lack of personal jurisdiction:

> Whether the courts of this State may exercise personal jurisdiction over a nonresident defendant involves a two-prong analysis: (1) Does a statutory basis for personal jurisdiction exist, and (2) If so, does the exercise of this jurisdiction violate constitutional due process? The assertion of personal jurisdiction over a defendant comports with due

---

[2] Defendant MDI-Parent filed its own Motion to Dismiss for lack of personal jurisdiction on January 16, 2015. The Court expresses no opinion at this time with respect to the merits of MDI-Parent's Motion to Dismiss, which will be briefed separately and calendared for hearing at a later date.

[3] The Court notes for clarification that this Order and Opinion represents a ruling on Defendants' Motions to Dismiss Plaintiff's Amended Complaint, which are predicated upon the same contentions and submissions presented in connection with Defendants' Motions to Dismiss Plaintiff's original Complaint.

process if defendant is found to have sufficient minimum contacts with the forum state to confer jurisdiction.

*Golds v. Cent. Express, Inc.*, 142 N.C. App. 664, 665–66, 544 S.E.2d 23, 25 (2001) (citations and quotation marks omitted). "The burden is on the plaintiff to prove by a preponderance of the evidence that grounds exist for the exercise of personal jurisdiction over a defendant." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671, 541 S.E.2d 733, 736 (2001). "In a situation where a defendant submits evidence to counter the allegations in a plaintiff's complaint, those allegations can no longer be taken as true and the plaintiff can no longer rest on the allegations." *Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 278, 646 S.E.2d 129, 133 (2007). "[T]he Court then considers (1) any allegations in the complaint that are not controverted by the defendant's affidavit and (2) all facts in the affidavit (which are uncontroverted because of the plaintiff's failure to offer evidence)." *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 693–94, 611 S.E.2d 179, 183 (2005). "Where unverified allegations in the complaint meet plaintiff's initial burden of proving the existence of jurisdiction . . . and defendant[s] . . . d[o] not contradict plaintiff's allegations in their sworn affidavit[s], such allegations are accepted as true and deemed controlling." *Inspirational Network, Inc. v. Combs*, 131 N.C. App. 231, 235, 506 S.E.2d 754, 758 (1998) (citation and quotation marks omitted) (ellipses in original).

{21} Here, the first prong of the two-pronged jurisdictional analysis, *supra*, is not at issue, as both Venesky and Gentry "concede that a basis for jurisdiction

exists under North Carolina's 'long-arm' statute."[4]   (Defs.' Br. Supp. Mot. to Dismiss, p. 3.)   With respect to the second prong of the analysis, it is well-established that in order to comport with the requirements of due process, there must exist "certain minimum contacts [between the non-resident defendant and the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation and quotation marks omitted) (alteration in original).  The "relationship between the defendant and the forum must be 'such that he should reasonably anticipate being haled into court there.'" *Id.* (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

{22}   "The United States Supreme Court has recognized two bases for finding sufficient minimum contacts: specific jurisdiction and general jurisdiction.  Specific jurisdiction exists when 'the controversy arises out of the defendant's contacts with the forum state.'" *Lab. Corp. of Am. Holdings v. Caccuro*, 212 N.C. App. 564, 569, 712 S.E.2d 696, 701 (2011) (quoting *Tom Togs, Inc. v. Ben Elias Industries Corp.*, 318 N.C. 361, 366, 348 S.E.2d 782, 786 (1986)).  General jurisdiction, on the other hand, "may be asserted over [a] defendant even if the cause of action is unrelated to [the] defendant's activities in the forum as long as there are sufficient 'continuous and systematic' contacts between [the] defendant and the forum state." *Replacements, Ltd. v. Midwesterling*, 133 N.C. App. 139, 145, 515 S.E.2d 46, 51 (1999) (citation omitted).

---

[4] North Carolina's long-arm statute is set forth in N.C.G.S. § 1-75.4.

{23}  "The Supreme Court has also said that for purposes of asserting 'specific' jurisdiction, a defendant has 'fair warning' that he may be sued in a state for injuries arising from activities that he 'purposefully directed' toward that state's residents." *Tom Togs*, 318 N.C. at 366, 348 S.E.2d at 786 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Where the dispute arises out of the defendant's contacts with the forum state, specific jurisdiction is at issue, and the Court's "focus should . . . be upon the relationship among [the defendant], this State, and the cause of action." *Id.*

{24}  Here, the undisputed evidence reveals that Venesky and Gentry, along with Luke, were the driving forces behind MDI-NC, the entity that performed and allegedly breached the Agreement, and also behind MDI-Parent, the entity that controlled MDI-NC, at all times relevant to this action.  For the reasons stated below, the Court finds that it can properly exercise specific personal jurisdiction over both Venesky and Gentry.

### Defendant Venesky

{25}  Venesky organized and managed MDI-NC and was a member, manager, and, in conjunction with Luke, a 99% owner of MDI-Parent.[5]

{26}  Venesky also executed a personal guaranty on the lease of the Asheville, North Carolina property at which the Agreement was performed.  (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 3, p. 4–6.)  The Court is cognizant that "[t]he mere *act* of signing . . . a guaranty or endorsement does not in and of itself constitute a

---

[5] MDI-Parent is owned 49.5% by Venesky, 49.5% by Luke, and 1% by an unrelated third party.  (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 3, p.3.)

sufficient contact upon which to base in personam jurisdiction over a nonresident." *United Buying Grp., Inc. v. Coleman*, 296 N.C. 510, 518, 251 S.E.2d 610, 616 (1979) (emphasis in original). Such a guaranty or endorsement is simply one fact to be considered in undertaking a minimum contacts analysis. *Id.* at 518, 251 S.E.2d at 615 (holding that "[t]he presence of minimum contacts is not to be determined by automatic application of per se rules such as the one adopted in *McDaniel*;[6] rather, the existence of minimum contacts depends upon the particular facts of each case").

{27} Nonetheless, the execution of a guaranty, in combination with other factors, can be evidence of minimum contacts, including on the record here. For example, in *Centura Bank v. Pee Dee Express, Inc.*, 119 N.C. App. 210, 211–14, 458 S.E.2d 15, 17–19 (1995), the North Carolina Court of Appeals upheld the trial court's exercise of personal jurisdiction over two individual defendants who had personally guaranteed leases executed by the defendant company – a South Carolina corporation in which the two individual defendants were officers and sole shareholders – with a North Carolina banking corporation, where the defendant company had customers in North Carolina, traveled within North Carolina, and "did some business in North Carolina." Similarly, here, Venesky's guaranty of the Asheville property lease agreement, when considered with his activities in controlling and directing MDI-NC as discussed below, is relevant evidence for purposes of the Court's minimum contacts analysis.

---

[6] In *Coleman*, the North Carolina Court of Appeals had interpreted *Trust Co. v. McDaniel*, 18 N.C. App. 644, 197 S.E.2d 556 (1973), to stand, in essence, for the blanket proposition that any personal guaranty of a promise made to a North Carolina creditor *per se* rendered the guarantor subject to personal jurisdiction in North Carolina. *Coleman*, 296 N.C. at 517–18, 251 S.E.2d at 615–16.

{28}    In seeking to minimize the import of Venesky's lease guaranty, Defendants emphasize the *Centura* court's additional holding that the spouses of the two corporate officers – who also had personally guaranteed the lease in question and were also named as defendants in the action – lacked sufficient minimum contacts to subject them to personal jurisdiction in North Carolina. *Id.* at 214–15, 458 S.E.2d at 19. Indeed, the *Centura* court determined that the marital interest that the spouses "potentially had in their husband's Pee Dee stock, standing alone, . . . [was] not a 'direct and substantial' commercial interest sufficient to support the trial court's assertion of personal jurisdiction and, in any event, [did] not demonstrate any 'purposeful availment' of the benefits and protection of North Carolina laws." *Id.* at 215, 458 S.E.2d at 19. Here, however, Venesky's interest in MDI-NC, as a 49.5% owner of the entity in control of MDI-NC, is considerably more direct and substantial than a speculative marital interest in the company's stock. Moreover, Defendants' continuing payments on this lease – which evidently are made by MDI-Parent on MDI-NC's behalf – not only reduce Venesky's potential personal liability, but also implicate Plaintiff's allegations in this action that MDI-NC has selectively paid certain creditors to Plaintiff's detriment.[7]

---

[7] The Court recognizes that the personal guaranties discussed in *Coleman* and *Centura* each pertained to the contracts out of which those actions arose. The Court, therefore, does not fundamentally disagree with Defendants' contention that there existed a tighter nexus between the personal guaranties and the disputes raised in those cases than that which exists in the present case, where Plaintiff is not a party to the Asheville property lease agreement. There is, nevertheless, a connection between the Asheville property lease agreement and Plaintiff's claims, as discussed above. Accordingly, the Court declines to exclude Venesky's personal guaranty of the Asheville property lease agreement from its inquiry into the nature of Venesky's contacts with North Carolina. *See, e.g.*, *Coleman*, 296 N.C. at 518, 251 S.E.2d at 615 (explaining that the minimum contacts analysis should not entail "automatic application of per se rules" but instead "depends upon the

{29} Additionally, it is undisputed that Venesky periodically discussed with Luke and Gentry the financial viability of continuing MDI-NC's operations and was involved with the winding up of MDI-NC's operations. Plaintiff's submissions also reveal a December 11, 2013 email from Luke to Venesky and Gentry in which Luke indicated that he had been questioned by an officer at SunTrust Bank concerning the proceeds of the sale to MedQuest and requested that they "discuss before I respond." (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 18.) Further, it is undisputed that, prior to the sale to MedQuest, Venesky participated in multiple telephone conferences concerning a potential sale of MDI-NC's assets to Plaintiff. (*Id.*, Ex. 3, p. 6.) These uncontroverted facts undermine Defendants' contention that Venesky was uninvolved with MDI-NC's day-to-day operations and are relevant in light of Plaintiff's claims in connection with MDI-NC's sale of its assets and alleged fraudulent transfers thereafter. *See Strother v. Strother*, 120 N.C. App. 393, 397, 462 S.E.2d 542, 545 (1995) (upholding trial court's exercise of personal jurisdiction over out-of-state defendant where "actions by [defendant] outside of North Carolina injured plaintiff in this state at the time business activities were being carried on by [a company in which defendant was an officer, director, and controlling shareholder] in North Carolina").

---

particular facts of each case"); *Combs*, 131 N.C. App. at 240, 506 S.E.2d at 761 ("The existence of 'minimum contacts' depends upon the particular facts of each individual case.").

{30}    The Court also notes that Venesky was one of only two individuals who executed MDI-NC's operating agreement,[8] which includes a North Carolina choice-of-law provision.  Although MDI-NC's operating agreement is not the subject of this action, its choice-of-law provision is, at the very least, indicative of Venesky's willingness to submit to this Court's jurisdiction with respect to matters concerning MDI-NC, *see Tejal Vyas, LLC v. Carriage Park, Ltd. P'ship*, 166 N.C. App. 34, 41, 600 S.E.2d 881, 887 (2004) (noting that a choice-of-law provision is "a factor in determining whether minimum contacts exist and due process was met"), and contributes to the totality of the circumstances indicating that Venesky "should reasonably anticipate being haled into court in this state."[9]  *Strother*, 120 N.C. at 395, 462 S.E.2d at 544 (citation and quotation marks omitted).

{31}    In short, the undisputed evidence indicates that Venesky participated in the control of MDI-NC – either directly as its manager or indirectly as a manager of MDI-Parent, which, in turn, controlled MDI-NC – both at the time that Defendants purportedly breached the Agreement and at the time that Defendants allegedly transferred MDI-NC assets with the intent of avoiding MDI-NC's payment obligations to Plaintiff.  *See Wyatt v. Walt Disney World Co.*, 151 N.C. App. 158, 165, 565 S.E.2d 705, 710 (2002) ("Specific jurisdiction exists if the defendant has

[8] Venesky signed MDI-NC's operating agreement twice: once on behalf of MDI-Parent, and again in his capacity as MDI-NC's manager.  Luke, who was the other signatory to the operating agreement, signed in his capacity as MDI-NC's manager.  (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 2, p. 14.)

[9] The Court notes that Venesky and Luke executed MDI-NC's operating agreement, including the North Carolina choice-of-law provision, in November 2009, less than three years prior to execution of the Agreement.  (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 2, p. 14.)

purposely directed its activities toward the resident of the forum and the cause of action relates to such activities.").

Defendant Gentry

{32} The evidence appears uncontroverted that Gentry negotiated the Agreement on MDI-NC's behalf and also served as Plaintiff's point of contact concerning MDI-NC's payments under the Agreement.[10]  *See Saft Am., Inc. v. Plainview Batteries, Inc.,* 189 N.C. App. 579, 594, 659 S.E.2d 39, 49 (2008) (Arrowood, J., dissenting) (finding personal jurisdiction over corporate officer defendant who "was *personally involved in negotiating and carrying out the contracts*" from which the lawsuit arose (emphasis added)), *rev'd for reasons stated in dissent,* 363 N.C. 5, 673 S.E.2d 864 (2009).

{33} Although Gentry did not perform the Agreement in North Carolina personally, "[l]ack of action by defendant in a jurisdiction is not . . . fatal to the exercise of long-arm jurisdiction[,]" *Tom Togs*, 318 N.C. at 368, 348 S.E.2d at 787; *Better Bus. Forms v. Davis*, 120 N.C. App. 498, 501, 462 S.E.2d 832, 834 (1995) (noting that "[i]t is well settled that a defendant need not physically enter North Carolina in order for personal jurisdiction to arise"); and, in any event, he negotiated the lease for the Asheville property where the Agreement was performed and participated in the hiring of MDI-NC employees who did perform the Agreement. (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 3, p. 29; Ex. 20.) Moreover, as MDI-NC's Chief Financial Officer ("CFO"), Gentry played a primary role in winding up MDI-NC. (*Id.*, Ex 3, p. 28–30.) He was therefore in a position of control with

---

[10] (Pl.'s Br. Opp. Mot. to Dismiss, Ex. 19.)

respect to the MDI-NC assets that Plaintiff alleges were fraudulently transferred following the sale to MedQuest.

{34} Finally, as noted above, Gentry participated in discussions and correspondence with Venesky and Luke concerning the viability of MDI-NC as a going concern and the sale of MDI-NC's assets to MedQuest. It is thus clear to the Court that Gentry, like Venesky, was instrumental to MDI-NC's operations – including but not limited to MDI-NC's performance and alleged breach of the Agreement – at all times relevant to this action.

{35} Defendants contend that Venesky's and Gentry's contacts with North Carolina in their capacities as MDI-NC's manager and CFO, respectively, are insufficient because such contacts are "corporate contacts." (Defs.' Reply Br. Supp. Mot. to Dismiss, p. 5–8.) Specifically, Defendants point to the following authority in support of their position:

> [U]nder North Carolina precedent the determination of whether personal jurisdiction is properly exercised over a defendant does not exclude consideration of defendant's actions merely because they were undertaken in the course of his employment. In particular, the corporate actions of a defendant who is also an officer and principal shareholder of a corporation are imputed to him for purposes of deciding the issue of personal jurisdiction. *On the other hand, personal jurisdiction cannot be based solely on a defendant's employment status as the agent or officer of a company with ties to North Carolina, or on personal connections to North Carolina that fall short of the requisite "minimum contacts."*

*Saft*, 189 N.C. App. at 600, 659 S.E.2d at 52 (Arrowood, J., dissenting) (emphasis added).

{36} Defendants appear to construe *Saft* to stand for the proposition that an individual's contacts with North Carolina, as developed solely through his status as a company officer, do not "count" – or at least, cannot alone suffice – to confer personal jurisdiction under a minimum contacts analysis. The Court disagrees with this interpretation and finds that *Saft* merely confirms, employing due process principles, that a corporate officer cannot reasonably expect to be haled into court in North Carolina *solely* because of his status as an officer of a company that does business in North Carolina or otherwise has sufficient minimum contacts with this State. *See, e.g., Robbins v. Ingham*, 179 N.C. App. 764, 771, 635 S.E.2d 610, 625 (2006) (providing that "personal jurisdiction over an individual officer or employee of a corporation may not be predicated *merely* upon the corporate contacts with the forum" (emphasis added)); *Centura*, 119 N.C. App. at 213, 458 S.E.2d at 18 ("[T]he 'minimum contacts' inquiry focuses on the actions of the non-resident defendant over whom jurisdiction is asserted, and not on the unilateral actions of some other entity.").

{37} By focusing on the latter portion of the above-quoted passage, Defendants seemingly discount Judge Arrowood's statement that "the corporate actions of a defendant who is also an officer and principal shareholder of a corporation *are imputed to him for purposes of deciding the issue of personal jurisdiction.*" *Saft*, 189 N.C. App. at 600, 659 S.E.2d at 52. The import of this statement is clear: a corporate officer's contacts with North Carolina – whether established in his individual capacity or in his capacity as an officer or agent of his company – *count*

for purposes of determining whether that particular individual has sufficient minimum contacts with North Carolina. *Saft*, 363 N.C. at 6, 673 S.E.2d at 864 (adopting Judge Arrowood's dissenting opinion); *Coleman*, 296 N.C. at 515, 251 S.E.2d at 614 (holding that where a "defendant is a principal shareholder of the corporation and conducts business in North Carolina as principal agent for the corporation, then his corporate acts may be attributed to him for the purpose of determining whether the courts of this State may assert personal jurisdiction over him"); *Centura*, 119 N.C. App. at 214, 458 S.E.2d at 18 (noting that two of the defendants "were officers and the only two shareholders" in the defendant company and that, "[t]herefore, the corporate acts of [the two individual defendants could] be imputed to them for the purpose of determining if they had sufficient minimum contacts"); *see also Calder v. Jones*, 465 U.S. 783, 790 (1984) (explaining that although the defendants' "contacts with [the forum state were] not to be judged according to their employer's activities there[,] . . . their status as employees [did] not somehow insulate them from jurisdiction").

{38} As applied to the instant case, *Saft* supports Plaintiff's position, not Defendants'. In particular, the evidence of record shows that Venesky and Gentry are not mere bystanders only passively associated with the transactions underlying Plaintiff's claims. Nor does Plaintiff assert that jurisdiction is proper over Venesky and Gentry solely by virtue of their status as officers of MDI-NC. To the contrary, Plaintiff asserts claims against all three of the Individual Defendants because, as the evidence reveals, Venesky, Gentry, and Luke share in the operation and control

of MDI-NC, either directly or indirectly through MDI-Parent, and have "purposefully directed" MDI-NC operations – in connection with but not limited to those concerning the Agreement – to be carried out in this State. *See, e.g.*, *Tom Togs*, 318 N.C. at 366–67, 348 S.E.2d at 786–87 (finding sufficient minimum contacts where out-of-state defendant had "made an offer to plaintiff whom defendant knew to be located in North Carolina[;] Plaintiff accepted the offer in North Carolina[;] . . . and defendant was 'aware that the contract was going to be substantially performed in this State'"); *Centura*, 119 N.C. App. 210, 211–215, 458 S.E.2d 15, 17–19 (exercising personal jurisdiction over individual defendants who personally guaranteed South Carolina defendant company's lease with North Carolina company because defendant company did "some business in North Carolina" and because the individual defendants had a "direct and substantial commercial interest" in defendant company as company officers and sole shareholders); *Davis*, 120 N.C. App. at 500–01, 462 S.E.2d at 834 (finding that "active negotiations to purchase a North Carolina business, some of which were conducted in North Carolina, demonstrate[d] a purposeful attempt by defendants to avail themselves of the privilege of conducting business in this State" and thus established sufficient minimum contacts – even with respect to an individual defendant who had never entered North Carolina or personally managed any of the North Carolina activities – "based on the benefits received by defendants from the underlying contract[,] which ha[d] a substantial connection with North Carolina").

{39} Finally, the Court notes "that a state has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors[,]" *Tom Togs*, 318 N.C. at 367, 348 S.E.2d at 787 (citing *Rudzewicz*, 471 U.S. at 473), and that there appears to be no evidence to suggest that Georgia residents Venesky and Gentry would be "unfairly prejudiced" if required to join Defendant Luke, also a Georgia resident, in litigating Plaintiff's claims in North Carolina. *See Combs*, 131 N.C. App. at 241, 506 S.E.2d at 761 (finding lack of prejudice a factor that weighed in favor of personal jurisdiction over out-of-state defendants).

III.
CONCLUSION

{40} The Court concludes, in light of the foregoing, that its exercise of *in personam* jurisdiction with respect to both Venesky and Gentry is proper and comports with the requirements of due process.[11] Defendants' Motions to Dismiss are, therefore, **DENIED**.

**SO ORDERED**, this the 21st day of January, 2015.

---

[11] Having determined that the Court's jurisdiction over Venesky and Gentry is proper under a specific jurisdiction theory, the Court declines to reach the parties' contentions concerning general jurisdiction.